IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JULIE DICKERSON, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Civil No. 16-cv-1246-JPG-CJP |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant.[1] | ) |

# MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Julie Dickerson, represented by counsel, seeks review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in January 2013 alleging disability beginning on September 14, 2012. After holding an evidentiary hearing, ALJ Bradley L. Davis denied the applications on July 2, 2015. (Tr. 11-19.) The Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final agency decision subject to judicial review. (Tr. 1).

Plaintiff has exhausted administrative remedies and has filed a timely complaint.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The residual functional capacity (RFC) determination was not supported by

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

substantial evidence.

2. The credibility determination was erroneous.

**<u>Applicable Legal Standards</u>**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are only to the DIB regulations out of convenience.

> disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to understand that the

scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Davis followed the five-step analytical framework described above. He determined that Ms. Dickerson had not been engaged in substantial gainful activity since the alleged onset date and that she was insured for DIB through December 31, 2017.[3]

The ALJ found that plaintiff had severe impairments of degenerative disc disease of the cervical and lumbar spine, and degenerative joint disease of the right shoulder. He found that these impairments do not meet or equal a listed impairment.

ALJ Davis concluded that plaintiff had the RFC to perform work at the sedentary

---
[3] The date last insured is relevant only to the claim for DIB.

exertional level, limited to occasional stooping, kneeling, crouching, and crawling; no overhead reaching with the right upper extremity; occasional overhead reaching with the left upper extremity; and no exposure to hazards such as unprotected heights or dangerous machinery.

Based on evidence from a vocational expert (VE), the ALJ determined that plaintiff could not do her past work, but she could perform other jobs which exist in significant numbers in the national and local economies, and, therefore, she was not disabled.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.    Agency Forms**

Plaintiff was born in 1969 and was almost 43 years old on the alleged date of disability. (Tr. 193.) She had a ninth-grade education and had worked in the past as a machine operator and a supervisory machine operator at a printing/mailing company. (Tr. 197-98).

In February 2013, plaintiff reported that she was unable to stand, sit or walk for "any period of time." Lifting hurt her neck, back, and shoulder. She spent most of the day lying in bed watching television. She had to put pillows under her legs and could not get comfortable on the couch or a chair. She lived with a roommate who helped with cleaning and laundry. She fed and watered her pets, but her roommate helped take care of them. She did not cook but did make sandwiches and frozen dinners. She had to take "many breaks" when doing household chores. Her roommate did the yard work and shopping. Plaintiff could not "do the walking" required by shopping. She had to change positions a lot and had to take a lot of breaks. She was taking

Oxycodone, Amitriptyline, Gabapentin, and Baclofen, which made her feel sleepy and interfered with her concentration. (Tr. 204 -11).

**2.     Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing in February 2015. (Tr. 28).

Plaintiff testified that she stopped working in September 2012 because walking, standing and sitting caused her pain in her back and neck. She saw an orthopedic surgeon who did MRIs and said she had bulging discs, herniated discs, and arthritis. He recommended pain medication and muscle relaxers. She took Vicodin at first, but it did not work, so she was switched to Percocet. Percocet is "a little stronger" but does not really have any effect on her pain. Both Vicodin and Percocet caused her to feel very sleepy and "a little loopy." She also took Gabapentin. (Tr. 31-33).

Plaintiff worked at her last job for twenty-five years. She quit because she could not physically do it anymore. She felt she could not do a sedentary job because sitting was very painful in her back and neck. (Tr. 38-39.)

A VE was supposed to testify via telephone, but the ALJ was unable to connect with her. (Tr. 39-40.) After the hearing, the ALJ sent a written interrogatory to the VE, asking a hypothetical question which corresponded to the RFC assessment. The VE responded that this person could not do plaintiff's past work, but that there were other jobs she could do. In response to a question from plaintiff's counsel, the VE stated that a person who had to change positions more frequently than every thirty minutes could not sustain competitive employment. (Tr. 281-97.)

6

3.  **Medical Records**

In December 2011, an MRI of the lumbar spine showed disc bulging at L2-3, disc protrusion at L3-4 and L4-5, and disc herniation at L5-S1. (Tr. 347-48).

Prior to the alleged onset of disability, plaintiff was treated by Dr. Schmidt, a pain management specialist from November 2011 to September 27, 2012. She was diagnosed with cervical spinal stenosis and lumbar disc herniation at L5-S1. She was given a series of epidural steroidal injections in the lumbar spine, which provided only temporary relief. She was prescribed Baclofen, Mobic, Percocet, Neurontin (Gabapentin), and Elavil. The medications helped for a while, but she reported in July 2012 that she was no longer getting any relief. She was tried on methadone, but she could not tolerate the side effects, so she was put back on Percocet. In September 2012, she reported that medications gave her about 50% relief. She was taking three or four Percocet a day. She was no longer working. (Tr. 364-94).

Plaintiff was seen by Dr. Riew, an orthopedic surgeon at Washington University School of Medicine, in July 2012 for neck and arm pain and weakness. She had the problem since 2009, but it had gotten worse in the last nine months. She had missed about a month of work. She had been treated with physical therapy, exercise, medications, epidural steroid injections, and nerve block injections. She was taking Oxycodone, Diclofenac, Baclofen, and Gabapentin. On exam, motor strength and sensation in the upper extremities were normal. Dr. Riew reviewed x-rays and an MRI and noted disc protrusion at C5-6 and C6-7 with foraminal narrowing and narrowing of the canal. He diagnosed axial neck pain without myelopathy. He did not recommend surgery because "treating neck pain with surgery does not provide any long-term relief." (Tr. 304-06).

The alleged onset of disability is September 14, 2012.

A lumber MRI done in May 2013 showed mild progression of multilevel disc changes compared to a prior study from March 2008. There was a focal annular tear at L5-S1 with moderate to severe foraminal stenosis and borderline central spinal stenosis. A cervical MRI showed an unchanged broad-based disc protrusion at C5-6 causing impingement on the spinal cord; this may have increased in size since the prior study from December 2011. There was a diffuse disc bulge at C6-7 and an unchanged mild bulge at C4-5. (Tr. 427-28).

Dr. Vittal Chapa examined plaintiff at the request of the agency in May 2013. Her gait was normal and she had no specific motor weakness or muscle atrophy. There was no paravertebral muscle spasm. She had limited lumbosacral spine flexion and limited range of motion of the cervical spine and right shoulder. She had moderate difficulty with tandem walking, walking on toes and heels, and squatting and arising. (Tr. 409-24.)

Plaintiff began seeing Dr. Bashir, a pain management specialist, in July 2013. She was given more lumbar epidural steroidal injections. Dr. Bashir noted tenderness and muscle spasm in the lumbar area. Her gait had an antalgic trace. She was prescribed Diclofenac Sodium, Oxycodone, and Gabapentin. (Tr. 439-64).

Dr. Bashir referred plaintiff to Dr. Heffner, a neurosurgeon, for evaluation of her neck and back pain. Plaintiff saw him in October 2013. She complained of chronic neck and back pain, as well as diffuse widespread pain in her upper and lower extremities. She said the injections had helped to some extent but had not provided a large amount of benefit. On exam, she was 4'11" tall and weighed 120 pounds. She had diffuse joint and muscle tenderness in her upper and lower extremities. Motor strength was normal and sensation was intact. Dr. Heffner concluded that her widespread symptoms and tenderness to palpation throughout her body "strongly suggest a

diffuse pain syndrome such as fibromyalgia."  He did not recommend surgery.  (Tr. 435-38).

Dr. Bashir's office continued to see plaintiff through January 2015.  (Tr. 433-64.)  Physical exam consistently showed tenderness and muscle spasm in the lumbar area.  (Tr. 474, 496.)  Beginning in May 2014, exam showed tenderness in the cervical spine as well.  (Tr. 500-01, 505, 509, 513, 517, 526, 530.)  The diagnoses were cervical facet arthropathy/DDD/spondylosis; lumbar facet arthropathy/DDD/spondylosis; and lumbar and cervical radicular pain.  (Tr. 476.)  Dr. Bashir did a lumbar medical branch block in February 2014, but plaintiff reported that it did not help.  (Tr. 486, 488.)  Dr. Bashir administered two epidural steroid injections in the lumbar area in March 2014.  (Tr. 489-94.)  In April 2014, plaintiff was still complaining of back pain and aching pain in her legs.  She continued taking a number of medications prescribed by Dr. Bashir, including Gabapentin and Oxycodone.  (Tr. 495-96.)  In May 2014, she complained of back and neck pain and said she had left sided lower back pain and sharp pain radiating to her left lower extremity.  Physical exam noted tenderness in the cervical spine along with tenderness and muscle spasm in the lumbar area.  (Tr. 500-01.)  In June 2014, Dr. Bashir noted that her overall functioning was improving and that the last set of lumbar injections helped.  (Tr. 511.)  Plaintiff was continued on the same medications.  In September 2014, she complained of pain and muscle spasms in the neck and pain in both knees.  (Tr. 520.)  In October and November 2014, she had a mild to moderate antalgic gait.  (Tr. 526, 530.)  Dr. Bashir administered another lumbar epidural steroidal injection in December 2014.  (Tr. 534-35.)  At the last visit on January 9, 2015, Dr. Bashir again noted a mild to moderate antalgic gait, tenderness in the cervical spine, and tenderness and muscle spasm in the lumbar area.  She was to continue on her current medications, which were said to be "helping some."  (Tr. 538-39.)

4.   **Medical Records Submitted to Appeals Council**

After the ALJ denied her application, plaintiff submitted additional records to the Appeals Council in connection with her request for review. (Tr. 1-5.) The medical records designated by the Appeals Council as Exhibit 14F (Tr. 542-45) were not before the ALJ. Those records cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).

## Analysis

The Court turns first to plaintiff's challenge to the ALJ's credibility findings.

Plaintiff argues that the ALJ misstated the record and did not give good reasons grounded in the evidence for his adverse credibility determination.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit Court of Appeals cases, "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and

restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186 at *3.[4]

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Id.*; *see also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, the reasons given by the ALJ for rejecting plaintiff's statements are not supported by the record and are not valid. ALJ Davis said that he found plaintiff not to be credible because of the objective evidence, her daily activities, lack of surgery, and the fact that she continued to take Percocet. (Tr. 15, 17.) None of these reasons hold up under close scrutiny.

The ALJ stated that the objective findings "fail to provide strong support" for her allegations of disabling symptoms. He then went on to provide a selective and partially erroneous summary of the medical evidence. (Tr. 15-16.) He said that plaintiff told Dr. Riew that she did not want neck surgery, which suggests that Dr. Riew recommended surgery and plaintiff refused. In fact, Dr. Riew's note indicates that he told plaintiff that he did not recommend surgery because "treating neck pain with surgery does not provide any long-term relief." (Tr. 304-06.) Further, the ALJ ignored the repeated positive findings on exams in Dr. Bashir's notes, which contradict his statement that an injection "appeared to effectively treat the pain." (Tr. 16.) On the contrary, the

---

[4] SSR 96-7p was superseded by SSR 16-3p, 2016 WL 1119029. SSR 16-3p became effective on March 28, 2016. *See* 2016 WL 1237954. SSR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." 2016 WL 1119029, at *1. SSR 16-3p continues to require the ALJ to consider the factors set forth above, which are derived from the applicable regulations. 2016 WL 1119029, at *5.

11

repeated injections and regular refill of medications such as Oxycodone and Gabapentin indicate that any relief was only temporary. Further, the ALJ did not explain how the MRI findings failed to provide "strong support" for plaintiff's claims of neck and back pain.

The ALJ stated that plaintiff's "activities of daily living showed that she is capable of performing simple work-like functions." He said her activities were watching television, doing household chores, taking care of pets, preparing simple meals, doing laundry, and driving a car. He cited to Exhibit 3E for this information.

Exhibit 3E is a function report submitted by plaintiff. In that report, she said that she spent most of the day lying in bed watching television, and she may do "small chores" off and on during the day. She had to put pillows under her legs and could not get comfortable in a chair on or on the couch. Taking care of pets amounted to giving them food and water. Her meal preparation consisted of making sandwiches or frozen dinners. She admitted doing "cleaning and laundry," but had to take many breaks and her roommate helped her. She was able to drive a car but only left the house a few times a week. (Tr. 204-11).

"We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has called improper consideration of daily activities "a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation." *Moore v. Colvin*, 743 F. 3d 1118, 1126 (7th Cir. 2014). The ALJ here failed to recognize that plaintiff said she needed to take breaks

and needed her roommate's help when doing simple household chores. And, the ALJ overstated the significance of her activities; the ability to put water in a pet's bowl and to make a sandwich is not indicative of an ability to sustain full-time work. *See Alaura v. Colvin*, 797 F.3d 503, 506 (7th Cir. 2015) (criticizing the ALJ for relying on plaintiff's ability to feed his cats and make sandwiches). Further, the fact that plaintiff watches television while lying in bed with pillows under her legs does not, as the ALJ concluded, indicate that "her pain is not so severe that she is unable to focus on her hobbies." (Tr. 17.) *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (expressing skepticism "that the ability to watch television for several hours indicates a long attention span").

ALJ Davis made contradictory statements regarding surgery. He first pointed out that she had not had surgery, which he interpreted to mean that she "had not exhausted all avenues of approach at relieving her symptoms." In the next sentence, he said that surgery had not been recommended, which indicated to him that "her symptoms had not reached a significant level to warrant such a procedure." (Tr. 17.) The first statement is incorrect; no doctor has suggested that surgery of any kind would alleviate plaintiff's symptoms, so she cannot be said to have failed to pursue any treatment that may relieve her symptoms. The second statement is an instance of an ALJ "playing doctor." The ALJ, as a layperson, is not qualified to conclude that neck and back pain, if serious enough, is always treated with surgery. *See Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015) (ALJ erred in concluding that plaintiff's back pain was not disabling because he had not undergone injections, in the absence of evidence that injections would have been appropriate treatment).

The erroneous credibility determination requires remand. "An erroneous credibility

finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014). Reconsideration of plaintiff's credibility will also require a "fresh look" at the medical opinions and plaintiff's RFC. *Id.* It is therefore not necessary to analyze plaintiff's arguments regarding the RFC assessment.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Julie Dickerson's application for social security benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   October 18, 2017**

s/ J. Phil Gilbert<br>
**J. PHIL GILBERT**<br>
**UNITED STATES DISTRICT JUDGE**